AUSA: Jeremiah Smith   Telephone: (313) 226-9100
AO 91 (Rev. 11/11) Criminal Complaint   Special Agent: Paul Staso   Telephone: (313) 965-2323

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

United States of America
v.
D-1 Tyrome Moore
D-2 Tyquise Moore

Case No. 2:25-mj-30631
Judge: Unassigned,
Filed: 10-09-2025 At 04:01 PM
CMP USA V. TYROME MOORE ET AL
(DA)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __September 5, 2025__ in the county of __Wayne__ in the __Eastern__ District of __Michigan__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2119 | Attempted Carjacking |
| 18 U.S.C. § 2 | Aiding & Abetting |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

_Complainant's signature_

Paul Staso, Special Agent
_Printed name and title_

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: October 9, 2025

City and state: Detroit, MI

_Judge's signature_

Hon. Elizabeth A. Stafford, U.S. Magistrate Judge
_Printed name and title_

# AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Paul J. Staso, being duly sworn, depose and state as follows:

## INTRODUCTION

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since March 2020. I am currently assigned to the Violent Crime Squad in the Detroit Division of the FBI. I have conducted or assisted in numerous investigations of federal and state violations, including crimes of violence, firearms, and drug trafficking. I have gained experience through training and everyday work related to these types of investigations

2. I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2501(7), that is, an officer of the United States who is empowered by the law to conduct investigations of and to make arrests for the offenses enumerated in 18 U.S.C. § 2516.

3. The information set forth in this affidavit is based on my investigation, review of documents, photographs, and videos, as well as review of information from other law enforcement agents and investigators, witnesses, individuals with knowledge of this matter, and information gained through my training and experience. The information in this affidavit is provided for the limited purpose of establishing probable cause and does not contain all details or facts known to law enforcement related to this investigation.

1

4. I submit this affidavit in support of a criminal complaint and arrest warrant for Tyrome Markki MOORE and Tyquise Marrki MOORE for violations of 18 U.S.C. §§ 2119 and 2 (Attempted Carjacking, Aiding and Abetting), which prohibits the attempted taking of a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation and with intent to cause death or serious bodily harm and the aiding and abetting of same.

## PROBABLE CAUSE

*D-1. D-2 and S-3 Try to Carjack the Victim by Force and Violence*

5. On September 5, 2025, Tyrome Marrki MOORE (D-1), Tyquise Marrki MOORE (D-2), and a third suspect (S-3) drove together from Flint, Michigan to Canton, Michigan, where they attempted to carjack a person whose identity is known to law enforcement ("Victim"). During the attempted carjacking, D-1 struck the Victim in the head with the firearm and S-3 fired multiple shots from a rifle at the Victim.

6. On September 5, 2025, at approximately 3:30 a.m., the Victim was in his vehicle, a Nissan Sentra, at a Shell gas station located on Michigan Avenue, in Canton, MI, in the Eastern District of Michigan.

7.      While the Victim was sitting in his vehicle, a silver Mitsubishi Outlander pulled up next to the Victim's vehicle D-1 exited the Outlander while holding a pistol and approached the Victim. At the time, D-1 was wearing a mask.

8.      D-1 then ordered the Victim to get out of his vehicle. While this was occurring, S-3, also wearing a mask, exited the Outlander armed with a rifle and went to the passenger side of the Victim's vehicle. Both D-1 and S-3 ordered the Victim to exit his vehicle.

9.      The Victim refused to exit his vehicle and drove away from the gas station to his residence, approximately two miles away from the gas station.

10.     Instead of going back to Flint, with D-2 driving, D-1, D-2, and S-3 followed the Victim in D-2's Outlander to the Victim's residence to again attempt to steal his vehicle.

11.     When the Victim arrived at his residence in Canton, in the Eastern District of Michigan, Southern Division, he was walking to the front door when he was assaulted by D-1.

12.     The Victim told law enforcement that D-1 approached him while still armed with a pistol. The Victim told law enforcement that D-1 struck the Victim in the head with the pistol, and then got into the driver's seat of the Victim's vehicle. The Victim stated that D-1 attempted to start the vehicle but was unsuccessful. D-1 then returned to D-2's Outlander.

13. As the Victim was trying to open the front door of his residence, several gunshots were fired at him. The Victim sustained multiple injuries from shrapnel caused by impacts of the bullets on the glass and façade of the residence.

*Blood on front porch of Victim's residence*



*Bullet hole through TV in Victim's living room*



4

14.     D-2 then drove D-1 and S-3 then drove away from the Victim's residence.

### *Law Enforcement Identify D-1 and D-2*

15.     Law enforcement responded to the Victim's residence and to the Shell gas station. At the Shell gas station, law enforcement reviewed security video that showed that while the Victim was sitting in his vehicle, D-1, D-2, and S-3 exited D-2's Outlander. D-1 went to the driver's side of the Victim's vehicle , S-2 went to the passenger side, and D-2 stood next to the Outlander.

16.     While processing the Victim's vehicle, law enforcement was able to recover from the vehicle several latent fingerprints, which were submitted to the Automated Fingerprint Identification System (AFIS) for analysis. AFIS is a commonly used law enforcement database that contains a collection of fingerprint records that can be analyzed. The initial submission to AFIS was negative for a match.

17.     On October 3, 2025, D-1 was arrested in Genessee County in an unrelated incident for felonious assault and carrying a concealed weapon. At the time of the incident, D-1 was in possession of a Ruger 9mm pistol. As a result of the arrest, law enforcement obtained D-1's fingerprints.

18.     On October 6, 2025, law enforcement received an AFIS alert that latent fingerprints obtained from D-1 following his arrest in Genesee County

5

matched latent fingerprints recovered from the Victim's vehicle after the attempted carjacking.

19. Following his arrest in Genessee County, D-1 provided his cellular telephone number, (XXX) XXX-0762, to law enforcement. An open source database also revealed that that (XXX) XXX-0762 was associated with D-1 and the cell phone provider was AT&T.

20. After being advised of the fingerprint match and being provided D-1's cell phone number, law enforcement obtained a State of Michigan search warrant for Timing Advance location data to determine if D-1's cell phone was in the area of the attempted carjacking at the relevant times.

21. A search of law enforcement databases showed that D-1 and D-2's address was XXXX Marlowe Drive, in Flint, MI.

22. Law enforcement was also able to determine that D-2 was the registered owner of a 2021 Mitsubishi Outlander, the same type of vehicle used in the attempted carjacking.

23. An open source search for D-2 revealed that he was associated with cell phone number (XXX) XXX-0995 and the cellular provider was AT&T.

24. Law enforcement subsequently obtained a State of Michigan search warrant for Timing Advance location data for (XXX) XXX-0995 associated with

D-2 to determine if D-2's cell phone was in the area of the attempted carjacking at the relevant times.

### *Analysis of location data provided by AT&T*

25. Pursuant to the above described search warrants, AT&T provided law enforcement with records for D-1 and D-2's cell phone numbers. Law enforcement analysis of location data for D-1 and D-2's cell phone numbers revealed that both cell phones connected to cell towers providing coverage to the Shell gas station during the attempted carjacking.

26. Furthermore, law enforcement analysis of location data for D-1 and D-2's cell phones revealed that both cell phones connected to cell towers providing coverage to the Victim's residence during the second attempted carjacking and shooting.

27. On October 6, 2025, law enforcement conducted surveillance in the area of D-1 and D-2's residence in Flint, MI. Law enforcement observed D-2's Outlander parked near the residence. Law enforcement also observed D-1 and D-2 as they exited and entered the residence and D-2's Outlander.

28. On October 8, 2025, law enforcement executed a State of Michigan search warrant on D-1 and D-2's residence.

29. While searching the residence, law enforcement recovered a pump action shotgun and a .223 caliber AR platform rifle. As described below, D-1 and

D-2 both admitted that the seized .223 rifle was one of the firearms that was used during the attempted carjacking at the Shell gas station and during the attempted carjacking and shooting at the Victim's residence.

30. On October 8, 2025, D-1 and D-2 were arrested and taken to the Canton Police Department.

### *Post-Arrest Interview of D-1*

31. On October 8, 2025, D-1 was interviewed by law enforcement at the Canton Police Department. D-1 read his *Miranda* rights and agreed to talk to law enforcement.

32. During the interview, D-1 stated that he, D-2, and S-3 drove to Detroit in D-2's Outlander to steal a car. D-1 saw the Victim's vehicle in a parking lot at an unknown location, and D-1, D-2, and S-3 followed it to the Shell gas station in Canton.

33. D-1 admitted to attempting to steal the Victim's vehicle by force, specifically by using a firearm. D-1 admitted that while armed with a firearm, he told the Victim to get out of the vehicle.

34. D-1 stated that after they were unsuccessful in stealing the Victim's vehicle, they (D-1, D-2, and S-3) followed the Victim to the Victim's residence.

35. D-1 stated that when they arrived at the residence, D-1 approached the Victim while armed with a pistol and swung at the Victim and the Victim fell to

the ground. D-1 stated that he did not remember striking the Victim in the head with the pistol and did not believe he did so.

36. D-1 stated that he got back in D-2's Outlander and as he did so, S-3 began shooting at the Victim's house. D-1 stated that when they were driving away, he (D-1) fired an unknown amount of shots from the pistol in the air.

37. During the interview, D-1 stated that he felt bad for the Victim and that he was "hoping they would get someone who kinda deserved it."

### *Post-Arrest Interview of D-2*

38. On October 8, 2025, D-2 was interviewed by law enforcement at the Canton Police Department. D-2 read his *Miranda* rights and agreed to talk to law enforcement.

39. D-2 stated that the night before the attempted carjacking S-3 contacted D-2 and D-1. S-3, who is a cousin of D-1 and D-2, told them that he was having trouble with a neighbor of D-1 and D-2. D-2 stated that the neighbor claimed to be a gang member and had threatened to kill S-3.

40. D-2 stated that S-3 told him and D-1 that they needed to get the neighbor before he gets them and that S-3 wanted to do a "drive-by" shooting of the neighbor using D-2's Outlander.

9

41.     D-2 stated that he did not want to use his Outlander in the drive-by shooting and that they would need to steal someone else's car to use for the shooting. D-2 admitted that they agreed to drive to the Detroit area to steal a car.

42.     D-2 stated that on the morning of the attempted carjacking, that D-1, D-2, and S-3 drove to the Detroit area in D-2's Outlander in order to steal a car. D-2 admitted that they had two firearms in the vehicle, a pistol and a rifle that belonged to D-2.

43.     D-2 stated that prior to arriving at the Shell gas station, they attempted another carjacking but were unsuccessful. D-2 stated that after the unsuccessful carjacking, they drove to another city because they believed the victim of that attempted carjacking would call the police.

44.     D-2 stated that at some point, they noticed the Victim's Sentra drive off from a parking lot at an unknown location. D-2 stated that they (D-1, D-2, and S-3) followed the Victim from an area D-2 believed was in Southfield to the Shell gas station.

45.     D-2 stated that after they arrived at the gas station, D-1 exited the Outlander armed with pistol and approached the driver's side of the Victim's vehicle and that S-3 exited the Outlander armed with D-2's rifle, and approached the Victim's vehicle. D-2 stated that S-3 opened the Victim's passenger door and

hit the Victim with the rifle and stole the Victim's cell phone so the Victim would not be able to call police.

46. D-2 stated that the Victim refused to exit his vehicle and drove away.

47. D-2 stated that at this point he was driving the Outlander and they followed the Victim to a neighborhood where S-3 fired D-2's rifle from the Outlander in the direction of the Victim's vehicle. Law enforcement later recovered .223 caliber cartridge casings from the area where D-2 stated that S-3 fired D-2's rifle.

48. D-2 stated that, at some point, they lost sight of the Victim and began driving out of the neighborhood when they saw the Victim pulling up to a house.

49. D-2 stated that he pulled up to the Victim's house and stopped. At that point, D-1 jumped out of the Outlander and attempted to get the car keys from the Victim. D-1 then got in the Victim's car to see if the keys were in the car.

50. D-2 stated that the Victim went to the front door of his house when S-3 started shooting D-2's rifle at the Victim's house. D-2 stated that D-1 and S-3 got back in D-2's Outlander and D-2 drove away.

51. D-2 admitted that they had previously removed the license plate from the Outlander, and after leaving the Victim's residence, D-2 pulled over at an unknown location so they could put the license plate back on the Outlander.

52. I have confirmed that the Victim's Nissan Sentra (the object of the attempted carjacking), was manufactured in Mexico. Therefore, the vehicle was "transported in interstate commerce."

## CONCLUSION

53. Based on the forgoing, there is probable cause to believe that on September 5, 2025, in the Eastern District of Michigan, Southern Division, that Tyrome Markki MOORE and Tyquise Marrki MOORE aided and abetted one another in the attempted taking of a motor vehicle from the Victim through the use of force, violence, and intimidation. Therefore, I respectfully request that this Court issue a complaint against Tyrome Markki MOORE and Tyquise Marrki MOORE for violating 18 U.S.C. §§ 2119 and 2.

_____
Paul J. Staso
Special Agent, FBI

Sworn to before me and signed in my presence and/or by reliable electronic means.

_____
ELIZABETH A. STAFFORD
UNITED STATES MAGISTRATE JUDGE

Date:   October 9, 2025